**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:17-cr-00270-005 |
| | ) | |
| WAQAR HUSSAIN KHAN, | ) | The Honorable Leonie M. Brinkema |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO HIS MOTION FOR AN ORDER PERMITTING INTERNATIONAL TRAVEL**

The government's opposition rests on a single premise: that Waqar Khan resisted returning to the United States for years and therefore cannot be trusted to return from a trip to Saudi Arabia. The documents the government itself commissioned, and the correspondence the government's own attorney wrote, refute that premise. The conduct the government does not mention, that Waqar Khan lived nearly five years openly and lawfully in Pakistan under no supervision of any kind, answers the fear the government asks this Court to indulge. And the officer charged with supervising Mr. Khan does not share that fear; the Probation Office does not oppose this trip. The motion should be granted on the conditions Mr. Khan offers.

**I. The Government's Own Documents Refute Its Account of the Return.**

The government tells the Court that Mr. Khan did nothing to facilitate his return, and that his interest in returning first surfaced in "a December 2022 request." Opp. at 2. The record the government built says otherwise.

Assistant United States Attorney James Gillis wrote to counsel on June 17, 2021. His first sentence acknowledges that Mr. Khan "is interested in the assistance of the U.S. government in returning to the United States." That is eighteen months before the date the government now gives the Court. On September 26, 2022, counsel asked AUSA Gibbs directly how to get Mr. Khan "here

to appear in the case." On October 3, 2022, AUSA Gibbs set out the government's proposal that Mr. Khan surrender to Pakistan's Federal Investigation Agency. On October 12, 2022, counsel confirmed that Mr. Khan "wants to move forward with the proposal" and asked whom he should contact. The affirmative step the government represents never occurred, agreement to the surrender mechanism, occurred on October 12, 2022, nine days after the government proposed it.

The government also relies on the May 23, 2023 memorandum it obtained from Pakistani counsel ("BNR Mem.," attached as Reply Ex. A), and characterizes that memorandum as having merely "outlined the process for submitting to extradition." Opp. at 2-3. The memorandum the government commissioned and provided to the defense establishes the opposite of what the government now argues. Its stated premise, at ¶ 2(f), is that "Khan has indicated his interest in turning himself in for extradition." The government asked its Pakistani counsel two questions: how Mr. Khan could surrender himself, and whether his extradition inquiry could be "tracked with Chaudhry's, so they may return together."[1]

The same memorandum forecloses the comparison the government draws to co-defendant Umar Chaudhry, who, the government notes, "did turn himself in." Opp. at 3. As of May 2023, Chaudhry was already "being held in detention in Pakistan,"[2] with his extradition inquiry "at the evidence stage."[3] Mr. Khan's inquiry, by contrast, "has not yet commenced, since Khan has neither been arrested nor yet surrendered himself."[4] The government contrasts a man already in custody with a man asked to place himself in custody, and treats the difference as a defect of character.

---

[1] BNR Mem. ¶¶ 5(a)-(b).
[2] BNR Mem. ¶ 2(e).
[3] BNR Mem. ¶ 4(a).
[4] BNR Mem. ¶ 4(b).

## II. The Delay the Government Emphasizes Is Explained by a Detention That Ran Nearly a Year Past the Sentence and by the Government's Own Inability to Say How Long a Second Detention Would Last.

Mr. Khan was arrested in Pakistan in December 2009 and sentenced there to ten years' imprisonment. Dkt. 225 at 2; PSR ¶ 77. He was not released until October 2020, more than ten years and nine months after his arrest, and longer than the sentence imposed. PSR ¶ 87. He had thus already served beyond his sentence when the United States asked him to surrender himself back into the uncertain custody of the same Pakistani authorities.

What that surrender entailed is described in the government's own commissioned memorandum. An arrest warrant for Mr. Khan was outstanding. Both available routes ended in detention of unspecified length: appearing before the FIA meant the agency would "execute the warrant of arrest, detain Khan and then produce him before the ADC(G),"[5] and appearing before the magistrate meant that officer would "pass appropriate orders for his detention."[6] Delivery to the United States could not occur for at least fifteen days after he was taken into custody, and the inquiry would issue at all only if Pakistan's Federal Government "th[ought] fit."[7] The one question that mattered to a man who had just served beyond his sentence, how long he would be held in Pakistani custody before the United States actually took custody of him, was a question the government could not answer. As AUSA Gillis had written in 2021, the process was controlled by Pakistani authorities, its timing could not be predicted, and the United States had "no control over" it.

A man's reluctance to surrender himself into indefinite foreign detention, months after that same system held him nearly a year past his sentence, is not evidence that he will flee a supervised

[5] BNR Mem. ¶ 14(a).
[6] BNR Mem. ¶ 14(b).
[7] BNR Mem. ¶ 9.

trip. It is the rational response of a person weighing the only terms he was offered. And Mr. Khan resolved even that reluctance. As the government concedes, he turned himself in to the FIA office in Islamabad on April 29, 2025. Opp. at 3. He surrendered voluntarily, knowing the United States would seek his detention on arrival, at a time when the government had spent more than four years unable to compel his return. The government's brief calls this being "extradited." Opp. at 3. He was not seized on a warrant. He turned himself in and returned voluntarily.

## III. Nearly Five Years at Liberty in Pakistan, Under No Supervision of Any Kind, Answers Both of the Government's Concerns.

The government's opposition returns repeatedly to conduct from 2009, when Mr. Khan was twenty-two, and quotes the Statement of Facts about intentions to reach Afghanistan and to confront United States forces. Opp. at 1-2. That conduct is now seventeen years old. The far more probative evidence of who this defendant is today is the record of what he did with nearly five years of complete freedom after his release.

From his release in October 2020 until his voluntary surrender in April 2025, Mr. Khan lived in Pakistan with no probation officer, no monitoring, and no obligation to report to anyone. His parents and siblings were all in the United States. He was, in the government's own phrase for the situation it now fears, "completely unsupervised." Opp. at 4. In those years he committed no offense of any kind. PSR ¶¶ 81-83. He married in February 2025. PSR ¶ 89. Counsel proffers that he also supported himself through employment and maintained his own apartment, and can furnish records of that employment and letters from his employers attesting to his performance. If Mr. Khan retained any intention of reaching Afghanistan, or of returning to the conduct of 2009, those years, unwatched and unsupervised in the very country the government fears, were his opportunity. He built a lawful life instead and then left it to surrender.

The government's concern that Mr. Khan "may" return to "the path that led him to Pakistan in 2009," Opp. at 5, is refuted by nearly five recent years in which he had every opportunity to do so and did not. The concern that he cannot be trusted while "completely unsupervised" abroad is answered by the fact that he has already lived completely unsupervised abroad, for nearly five years, and complied with the law throughout. A trip under a filed itinerary, a surrendered passport, daily check-ins, and the threat of revocation of a twenty-year term is far more supervision than Mr. Khan was under for the entire period on which the government's fear must rest.

## IV. The Officer Who Supervises Mr. Khan Does Not Oppose the Trip.

The government's opposition concedes that the Probation Office "has taken a neutral position on the request and has expressed no objection to having the defendant obtain a passport." Opp. at 3-4. The officer charged with supervising Mr. Khan day to day, who has observed his compliance, does not oppose this travel and has no objection to his obtaining a passport. The party that supervises Mr. Khan is not opposed; the party that does not supervise him is the sole objector.

## V. The Government's Enforceability Concerns Are an Argument Against All International Travel and Are Answerable With Conditions.

The government argues that a home visit under Standard Condition 6, and computer monitoring under Special Condition 2, cannot be performed while Mr. Khan is in Saudi Arabia. Opp. at 4-5. That is true, and it is equally true of every international trip by every person on supervised release to every destination. A probation officer cannot conduct an in-person home visit in any foreign country. If that impossibility defeats a travel request, then no supervised person could ever travel internationally, and Standard Condition 3, which expressly permits travel outside the district with the permission of the court or the probation officer, would be meaningless. The government's argument is not about Saudi Arabia, and it is not about this defendant. It is an argument that no person on supervised release should be permitted to travel abroad.

Mr. Khan will surrender his Pakistani passport and any other Pakistani travel document to the Probation Office before departure and travel solely on a United States passport, which eliminates any ability to enter Pakistan without a visa. He will book through a licensed United States operator and file his full itinerary, his lodging, and a confirmed return reservation with the Probation Office before he leaves. He will check in with the Probation Office as instructed and will report to that office in person before departure and within seventy-two hours of his return. The government's suggestion that Mr. Khan might travel onward from Saudi Arabia to some other country ignores that he will hold only a United States passport, that his itinerary and return will be on file, and that any deviation is a violation exposing him to revocation of a twenty-year term of supervised release. Every condition of supervision rests on that exposure, in Alexandria as in Mecca.

The requested permission is committed to this Court's discretion. Standard Condition 3 authorizes the Court to permit Mr. Khan to leave the district, and Section 3583(d)(2) requires that any restriction on his liberty be no greater than reasonably necessary. A categorical prohibition on all foreign travel, at any point across a twenty-year term, imposed on a defendant whom this Court found to pose a low risk of future substance abuse, and on whom this Court imposed no travel restriction or passport condition at sentencing, is a greater deprivation than this record supports.

## VI. The Requested Relief.

Mr. Khan asks the Court to permit him to travel to Saudi Arabia for 28 days, within a window to be approved by the Probation Office, to perform the Umrah pilgrimage and to be with his wife, whom he cannot bring to the United States because no date has been set for her visa. He proposes a window beginning on or about February 8, 2027, which corresponds to the month of Ramadan and to the approach of the second anniversary of a marriage in which the couple have

spent barely three months together. Mr. Khan has accepted responsibility for his conduct, as his guilty plea and this Court's acceptance-of-responsibility reduction reflect, and asks only to resume an ordinary married life; the prolonged separation from his wife is taking a serious toll on that marriage. Mr. Khan will consent to each of the following conditions, and to any others the Court and the Probation Office deem appropriate:

1. Travel confined to the corridor of Jeddah, Mecca, and Medina, with no other travel within Saudi Arabia and no entry into or transit through Pakistan or any other country;
2. Travel on a United States passport only, with his Pakistani passport and any other Pakistani travel document surrendered to the Probation Office before departure and held until his return;
3. Direct air travel only, with no segment on a Pakistani carrier and no layover in Pakistani territory;
4. Booking through a licensed United States pilgrimage operator, with the group itinerary, lodging, and a confirmed return reservation filed with the Probation Office before departure;
5. Daily check-in with the Probation Office, in whatever form that office directs;
6. In-person reporting to the Probation Office before departure and within seventy-two hours of return;
7. A device configured by the Probation Office for the trip, and compliance with all directions of that office concerning his devices while abroad;
8. Notification to the Federal Bureau of Investigation, and a pre-travel and post-travel interview if the Bureau requests one; and

9. Immediate report to the Probation Office of any contact or communication that could implicate the no-association condition of his supervision.

For the foregoing reasons, Mr. Khan respectfully requests that the Court grant his motion and enter an order permitting the travel described above on the stated conditions.

Respectfully submitted,

WAQAR HUSSAIN KHAN
By Counsel

_______/s/________________________
Pleasant S. Brodnax, III
VSB No. 26477
1701 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C. 20006
(202) 462-1100
pleasant@pleasantbrodnax.com
Counsel for Defendant Waqar Hussain Khan

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of September, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

_______/s/________________________
Pleasant S. Brodnax, III